**FORD & DIULIO PC**
Brendan M. Ford (Bar No. 224333)
BFord@FordDiulio.com
Kristopher P. Diulio (Bar No. 229399)
KDiulio@FordDiulio.com
3200 Park Center Drive, Suite 210
Costa Mesa, California 92626
Telephone: (714) 450-6830

**SQUITIERI & FEARON, LLP**
Lee Squitieri (*pro hac vice* forthcoming)
lee@sfclasslaw.com
205 Hudson, 7th Floor
New York, New York 10007
Telephone: (212) 421-6492

**MOORE LAW, PLLC**
Fletcher Moore (*pro hac vice* forthcoming)
fletcher@fmoorelaw.com
30 Wall Street, 8th Floor
New York, New York 10005
Telephone: (212) 709-8244

Attorneys for Derivative Plaintiff
MELONIE SCHULTZ

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Melonie Schultz, derivatively on behalf of STITCH FIX, INC., | Case No. |
| Plaintiff, | **Verified Stockholder Derivative Complaint for: (1) Violations of Section 14(a) of the Exchange Act; (2) Contribution Under Section 11(f) of the Securities Act and Section 21D of the Exchange Act; (3) Contribution Under Sections 10(b) and 21D of the Exchange Act; (4) Breach of Fiduciary Duty (Derivative); (5) Breach of Fiduciary Duties; (6) Unjust Enrichment** |
| vs. | |
| KATRINA LAKE, J. WILLIAM GURLEY, MIKKEL SVANE, SHARON MCCOLLAM, ELIZABETH WILLIAMS, STEVEN ANDERSON, NEAL MOHAN, ELIZABETH SPAULDING, MARKA HANSEN, MIKE SMITH, AND KIRSTEN LYNCH, | |
| Defendants, | **DEMAND FOR JURY TRIAL** |

**COMPLAINT**

STITCH FIX, INC.,

                Nominal Defendant.

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Melonie Schultz ("Plaintiff"), by and through her attorneys, derivatively and on behalf of Nominal Defendant Stitch Fix Inc. ("Stitch Fix" "SFI" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Katrina Lake, J. William Gurley, Mikkel Svane, Sharon Mccollam, Elizabeth Williams, Steven Anderson, Neal Mohan, Elizabeth Spaulding, Marka Hansen, Mike Smith, and Kirsten Lynch  (the "Individual Defendants") and together with Stitch (collectively the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Stitch Fix, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and for violations of Section 14(a) of the Exchange Act and contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiff's information and belief as to all other matters is based upon her counsel's investigation, which includes a review and analysis of: (i) filings in a class action lawsuit alleging violations of federal securities laws captioned *Retail Wholesale Department Store Union Local 338 Retirement Fund et al v. Stitch Fix, Inc. et al*, Docket No. 4:22-cv-04893 (N.D. Cal.) (the "Securities Action") including the statements therein of cooperating witnesses; (iii) Stitch Fix's filings with the U.S. Securities and Exchange Commission ("SEC"); (iv) Stitch Fix's press releases, website, corporate governance documents, presentations, and conference calls; and (v) analyst reports and other publicly available information concerning Stitch Fix.

## I.  NATURE AND SUMMARY OF THE ACTION

1.    This is a shareholder action brought on behalf of Stitch Fix against the Defendants for breaches of fiduciary duty.

2.    This case seeks, among other things, to recover damages to Stitch Fix from fiduciary breaches and insider trading profits from certain defendants realized between December 7, 2020 and June 9, 2022 (the "Relevant Period") while in possession of material adverse non-public information ("MNPI") about material changes to SFI's business model, and  the downward trend of its operations. SFI's new business model, "Freestyle" or "Direct Buy," was undercutting its original business model "Fix," a subscription-based service in which customers were required to pay for an entire box of curated clothing with multiple items.

3.    Based in San Francisco, California, Stitch Fix began as an online only retailer selling a range of apparel, shoes, and accessories through its website and mobile application exclusively through a subscription model through which the customer for a small fee would receive a monthly box of items chosen by a personal stylist. The customer would not know specifically which items they were receiving but would have the option to return whichever items it did not want and pay for the items they kept.

4.    On December 8, 2020, pivoting from the "Fix" subscription box business model, Stitch Fix launched the "Freestyle" program—a new, direct buy program where customers could select from the outset which individual items to purchase without having to take delivery of an entire box.  The "Freestyle" program converted SFI into just another e-commerce retailer. This drastically changed Stitch Fix's business model and threatened Stitch Fix's original business model as SFI's Freestyle program cannibalized customers from its subscription business known as "Fix."

5.     In connection with the December 8, 2020 announcement, Stitch Fix touted the Freestyle program as a way to "expand our addressable market, deepen client engagement and grow wallet share over time."  The Company also stated that Freestyle would "serve as another catalyst as we attract new clients, convert prospective clients and reactivate lapsed clients."   These revenue generating promises never materialized and were soon proven to be false.

6.     Even as results rolled in soon after December 2020 showing that Freestyle cannibalized from Stitch Fix, for an entire year after introducing Freestyle, Stitch Fix touted that the two programs were synergistic, and repeatedly denied claims that the Freestyle program was undermining the legacy Fix business.

7.     On December 7, 2021, however, Stitch Fix admitted for the first time that the Company had downplayed the magnitude of the adverse experience of its transition from the subscription-based Fix model to the e-commerce retail-based Freestyle model. Stitch Fix finally admitted that the Company saw cannibalization and decline in "actions" customers "short term" and an increase in "dormancies" (inactive customers not yet purged from the "active" rolls.

8.     Stitch Fix announced a loss for its first quarter of 2021 and cut its full-year revenue projections.

9.     As a result of these disclosures, the price of Stitch Fix stock declined by $5.97 per share, or 24%, from $24.97 per share to $19.00 per share.

10.   However, Stitch Fix failed to disclose this information to the public and continued to assure investors throughout December 2021, January 2022 and February 2022 that these were short-term problems, claiming that the Company had "been testing client onboarding flows" and that "we see significant new client potential ahead as Freestyle enables us to access a greater share of shopping occasions."

1

2      11.   As SFI's deteriorating performance became increasingly clear to

3  management, especially Defendant Lake, who was the Stitch Fix CEO and

4  person with the most insight into the Company's catalysts, and other Stitch Fix

5  insiders began to sell substantial stock—with Defendant Lake selling almost

6  $70,000,000 in stock in 2021 alone, the most Defendant Lake had  ever sold in a

7  single year.

8      12.   Throughout this relevant period, the Insider Trading Defendants (as

9  defined below) were well aware of these systemic and devastating changes to the

10  Stitch Fix business model.  Despite having this knowledge of material nonpublic

11  information, the Insider Trading Defendants sold tens of millions of dollars of

12  stock while concealing the fact that its business would soon experience severe

13  headwinds with a concomitant stock price drop.

14      13.   On January 6, 2022, SFI announced that its Board of Directors has

15  authorized a share repurchase program where Stitch Fix may purchase up to $150

16  million of its Class A common stock.

17      14.   "This share repurchase program reflects the confidence we have in our

18  strategy, unique value proposition and the growth potential ahead for Stitch Fix,

19  which we believe is not reflected in the current market valuation," said Elizabeth

20  Spaulding, CEO of Stitch Fix. "As a company, we are committed to creating

21  long-term, sustainable value for our shareholders and our employees, and believe

22  a share repurchase program, in addition to the disciplined investments we are

23  making, will allow us to unlock the long term opportunity we see ahead. We

24  remain relentlessly focused on continuing to build and improve on our unique

25  client experience in the months and years to come as we continue on our journey

26  to become the global destination for personalized shopping, styling and

27  inspiration."

28

15.   Then, on March 8, 2022 the truth was partially revealed for the first time when Stitch Fix offered a weak outlook for its third quarter of 2022 (ending April 30, 2022) and once again cut its revenue guidance for the full year. In addition, Stitch Fix announced a self-inflicted "friction" between the Freestyle program and the Fix program. Specifically, Stitch Fix explained that when customers visited Fix—the primary landing page for customers interested in the Fix box model—the Company directed them to the Freestyle experience first, and "therefore, in leading clients to the Freestyle experience first, [it] inadvertently created friction" for potential customers interesting in ordering Fix.

16.   As a result of this disclosure, the price of Stitch Fix stock declined by $0.67 per share, or 6%, from $11.01 per share to $10.34 per share.

17.   Stitch Fix continued to decline, and from the start of the relevant period on December 7, 2020 to the end on June 9, 2022, Stitch Fix stock fell from $60.06 per share to $6.34 per share, down almost 90%.

18.   In light of the above misstatements and omissions, the Securities Action commenced on August 26, 2022.

19.   Lead counsel in the securities class action undertook an extensive investigation involving numerous former employee witnesses proving Stitch Fix knew or should have known its statements were false.

20.   The former employees gave damaging testimony on Stitch Fix's actual knowledge of its struggle evidence by multiple tests with Freestyle and its efforts to hide the truth from analysts, the market and the public.

21.   For instance, as alleged in the securities action, former employee one ("FE 1") explained that the Data Science team at Stitch Fix ran a test that they referred to internally as the "New Fix Customer Test." According to FE 1, through the New Fix Customer Test, the Data Science team would use their framework and methodology around multi-variant testing to model out what

completion looked like through the onboarding function. FE 1 confirmed that they understood from the New Fix Customer Test that Direct Buy was going to negatively impact customer acquisition. Specifically, according to FE 1, the Company's onboarding process would sacrifice customers who came in for a Fix, were funneled to Direct Buy, and then ultimately did not make a purchase or they bought less. FE 1 explained that the Direct Buy customers were converting at a lower rate, or they would spend less money, compared to Fix customers.

22.    In the securities class action, Plaintiffs there filed a Second Amended Consolidated Class Action Complaint as to which the District Court denied Defendants' motion to dismiss in large part on July 9, 2025 (ECF No. 101). As relevant here the Court in its Order held that the class Plaintiffs stated a claim under Section 10b-5 against Stitch Fix, Spaulding and Lake and that statements made by Lake and Spaulding in December 2020; February 2021; June 2021 and September 2021 were "directly contradicted" by "what Defendants knew at the time." *Id*. At ECF No. 101, pg. 9.

23.    The Court also held it was reasonable to infer from allegations about the "A/B database and the data therein and the allegations of the Defendants' review thereof that "Defendants would have had knowledge of the results of June 2020 tests [which revealed information which contradicted their public statements] by December of that year." *Id*. at 12. In addition, the court held specifically with respect to Defendants Lake and Spaulding, Class Plaintiffs plead fact sufficient to support a "strong inference" of scienter. *Id*. 13-16.

## JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14 of the Securities Exchange Act (15 U.S.C. § 78(n); Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b)), Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

25.   This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.   This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

## II.   THE PARTIES

### PLAINTIFF

27.   Plaintiff is, and at all relevant times has been, a shareholder of Stitch Fix during the Relevant Period.

### INSIDER TRADING DEFENDANTS

28.   Defendant Katrina Lake ("Lake") is the founder of Stitch Fix.  Lake sold $69,231,084.00 worth of Stitch Fix stock during the relevant period.  Lake has served as the Company's CEO since February 2011 until July 2021.   On January 4, 2023, the Board of Directors appointed Lake, the Company's Founder and Executive Chairperson of the Board of Directors, as CEO, effective January 5, 2023, to replace defendant Elizabeth Spaulding and serve in an interim capacity for six months or until her successor is appointed, or until such other date as may be mutually agreed by Lake and the Board of Directors. Lake is currently a non-executive employee of the Company. She has been a member of the Board of Directors since the Company's inception in 2011.

29.   Defendant Elizabeth Spaulding ("Spaulding") sold $1,472,927.00 worth of Stitch  stock during the relevant period.  Spaulding was the Stitch Fix CEO from August 1, 2021 to January 5, 2023.  On January 4, 2023, in connection with the Company's reduction in force, the Company and Spaulding agreed that she would step down from her employment with the Company and from the Board of Directors, effective January 5, 2023.  In connection with Ms. Spaulding's termination of employment, she entered into a separation agreement with the Company that provides she will receive 12 months of salary

and 15 months of health care coverage reimbursement and will provide consulting services to the Company through March 31, 2023.

30. Defendant Marka Hansen ("Hansen") sold $3,071,995.00 worth of Stitch stock during the relevant period. Hansen served as a Company director from 2013 to January 1, 2022. On December 20, 2021, Hansen notified Stitch Fix of her resignation from the Company's Board of Directors, effective January 1, 2022. For the fiscal year ended July 30, 2022, Hansen received $22,083.00 in fees earned or paid in cash, $74,135 in stock awards, $81,440 in option awards, and $177,658.00 in total compensation.

31. Defendant Mike Smith ("Smith") sold $18,057,384 worth of Stitch Fix stock during the relevant period. Smith served as a Company director from 2020 to December 13, 2022. Smith served as Stitch Fix's Chief Operating Officer from September 2017 to January 2021. He also served as interim Chief Financial Officer from January 2020 to January 2021. Previously, he served as General Manager, Stitch Fix Men from March 2016 to September 2017 and as our Chief Operating Officer from June 2012 to March 2016. On October 7, 2022, Mike Smith notified Stitch Fix of his decision to retire from the Company's Board of Directors, effective upon the completion of his current term at the time of the Company's 2022 Annual Meeting of Shareholders on December 13, 2022.

32. Defendant Mitchell Lasky ("Lasky") sold $10,000,620.00 worth of Stitch Fix stock during the relevant period. Lasky is a beneficial owner owning, directly or indirectly, through "Benchmark," an entity controlled by Lasky, more than 10% of SFI stock.

33. Lake, Spaulding Hansen, Smith, and Lasky are collectively referred to as the "Insider Trading Defendants" or individually as an "Insider Trading Defendant").

34.   The Insider Trading Defendants collectively sold approximately $102,049,877.00 worth of Stitch Fix stock while in possession of material adverse non-public information.

**FORMER DIRECTOR DEFENDANTS**

35.   Defendant Neal Mohan ("Mohan") served as a member of the Board from October 2020 until December 15, 2023.  He announced his resignation from the board on December 13, 2023, effective December 15, 2023.  He served as a member of the Board's Nominating and Governance Committee. According to the Company's public filings, Mohan received $210,575 in compensation from the Company in 2022.

36.   Defendant Mikkel Svane ("Svane") served as a member of the Board from October 2018 until March 20, 2023, when Svane notified Stitch Fix of his resignation from the Company's Board of Directors, effective immediately.  He served as a member of the Board's Compensation Committee. According to the Company's public filings, Svane received $215,082 in compensation from the Company in 2022.

37.   Defendant Kirsten Lynch  ("Lynch") served as a member of the Board from March 14, 2018 until May 13, 2022.  On April 13, 2022, Lynch notified Stitch Fix of her resignation from the Company's Board of Directors, effective May 13, 2022.  She served as a member of the Board's Compensation Committee. According to the Company's public filings, Svane received $214,802 in compensation from the Company in 2020 and $252,334 in compensation from the Company in 2021.

**CURRENT DIRECTOR DEFENDANTS**

38.  Defendant Elizabeth Williams ("Williams") has served as a member of the Board since January 2019 and serves as Chairperson of the Board's Compensation Committee and as a member of the Audit Committee. According

to the Company's public filings, Williams received $230,575 in compensation from the Company in 2022.

39.   Defendant Steven Anderson ("Anderson") served as a member of the Board from April 2011 until his resignation effective September 6, 2024.  While a member of the Board, he served on the Board's Compensation Committee. As of November 1, 2022, Defendant Anderson controlled over 34% of the Company's voting interests through his direct ownership of 11,875,544 shares of Stitch Fix Class B common stock through "Baseline Ventures."

40.   Defendant J. William Gurley ("Gurley") has served as a member of the Board since August 2013 and serves as Chairperson of the Board's Nominating and Governance Committee and as a member of the Audit Committee. As of November 1, 2022, Gurley held 3,219,133 shares of the Company's Class A Common stock, as well as 3,587,821 shares of its Class B common stock, equal to over 11.5% of the Company's voting interests.

41.   Defendant Sharon McCollam ("McCollam") has served as a member of the Board since November 2016 and serves as Chairperson of the Board's Audit Committee and as a member of the Nominating and Governance Committee. According to the Company's public filings, McCollam received $240,575 in compensation from the Company in 2022.

42.   Defendants McCollam, Gurley and Williams are herein referred to as the "Audit Committee Defendants."

**THE CURRENT BOARD**

43.   Stitch Fix current eight-member board of directors consists of defendants (1) Lake, (2) Gurley, (3) McCollam, and (4) Williams, plus non-Defendant directors (5) Baer, (6) Baxter, (7) Tan and (8) Amoo-Gottfried.

### III. DUTIES OF STITCH FIX OFFICERS AND DIRECTORS

#### A. <u>Duties Under Delaware Law</u>

44. By reason of their positions as officers, directors, and/or fiduciaries of Stitch Fix and because of their ability to control the business and corporate affairs of Stitch Fix, the Individual Defendants owed Stitch Fix and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Stitch Fix in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Stitch Fix and its shareholders so as to benefit all shareholders equally

45. Each director and officer of the Company owes to Stitch Fix and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

46. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Stitch Fix, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

47. To discharge their duties, the officers and directors of Stitch Fix were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

48. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Stitch Fix, the absence of good faith

on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

49.   As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

50.   Each of the Individual Defendants further owed to Stitch Fix and the shareholders the duty of loyalty requiring that each favor Stitch Fix' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

51.   At all times relevant hereto, the Individual Defendants were the agents of each other and of Stitch Fix and were at all times acting within the course and scope of such agency.

52.  Because of their advisory, executive, managerial, directorial, and controlling positions with Stitch Fix, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

53.  The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Stitch Fix.

**B.  <u>Stitch Fix's Code Of Conduct For Insider Trading</u>**

54.  According to Stitch Fix codes:

Insider Trading Employees who have access to material "inside" information about Stitch Fix or other companies are not permitted to use or share that information for stock trading purposes. All non-public information about Stitch Fix or about companies with which we do business is considered inside information. Such information includes, without limitation, financial results, hiring plans, buying plans, business metrics, unannounced partnerships, and product changes. Information is "material" if it might be useful to an investor in deciding to buy or sell securities of the company in question. Using material non-public information in connection with buying or selling securities, including giving "tips" to others who might make an investment decision on the basis of that information, is a crime that can result in severe penalties. When handling inside information, take care to prevent its disclosure. You should only discuss inside information with other employees on a limited,

"need to know" basis. You shouldn't share inside

information with people outside of Stitch Fix other than

people engaged by the Stitch Fix to provide professional

assistance, and even then only on a "need to know" basis.

If you have questions about making a stock trade or

passing on non-public inside information, please refer to

our Insider Trading Policy, contact the Stitch Fix legal

department, or contact your personal legal counsel.

### C. Stitch Fix's Global Code of Conduct

55.    Stitch Fix's Global Code of Conduct (the "Code of Conduct"),

effective November 16, 2017, is designed to help the Company's employees,

officers, directors, and contractors (referred to collectively as "employees")

understand their legal and ethical obligations and "to reinforce Stitch Fix's

commitment to honest and ethical conduct in all that [it does]."

56.    In a section titled "Compliance with Laws, Rules, and Regulations," the

Code of Conduct states:

Obeying the law, in letter and in spirit, is the minimum

standard at Stitch Fix. We expect employees to

understand the basic legal requirements applicable to their

role. While you're not always expected to know the

details of each law, it's important to know enough to

determine when to seek advice from managers or the

legal department, which you should do anytime you're

uncertain about the application of any law to your work.

57.    In a section concerning record-keeping, financial controls,

and disclosures, the Code of Conduct states, in relevant part:

Stitch Fix doesn't ever improperly adjust our reporting or recordkeeping for any reason. We record and report the truth.

We have adopted financial controls in accordance with Stitch Fix's internal needs and the requirements of applicable laws. These established accounting practices and procedures must be followed to assure the complete and accurate recording of all transactions. All employees, as applicable to your role, are expected to adhere to these procedures. For most, that means proper documentation and reporting of expenses. For those working on our finance team, that means that any accounting adjustments that materially depart from generally accepted accounting principles must be approved by the audit committee of the Board of Directors and reported to Stitch Fix's independent auditors.

*          *          *

Securities laws require full, fair, accurate, timely and understandable disclosure in our periodic reports with the Securities and Exchange Commission and that we fairly present our financial condition and results of operations. Employees who are involved in or responsible for these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about Stitch Fix that would be important to enable stockholders and potential investors to assess the soundness and risks of our

business and finances and the quality and integrity of our
accounting and disclosures.

Violation of these provisions shall result in disciplinary
action, up to and including termination, and may also
subject the violator to substantial civil and criminal
liability. If an employee becomes aware of any
accounting error or improper transaction or accounting
practice concerning Stitch Fix resources, she or he should
report the matter immediately to her or his manager, the
legal department, the finance department, or to a member
of the audit committee of the Board of Directors. You
may also raise your concern anonymously by calling 844-
337-3608 or visiting stitchfix.ethicspoint.com. There will
be no retaliation against employees who disclose
questionable accounting or auditing matters.

**D. Stitch Fix's Audit Committee Charter**

58.  Stitch Fix's Audit Committee Charter, approved by the Board on
October 16, 2018, states that the primary purpose is to act on behalf of the Board
in fulfilling the Board's oversight responsibilities with respect to:

(i)    the Company's corporate accounting and financial reporting
       processes, systems of internal control over financial reporting and
       audits of financial statements, systems of disclosure controls and
       procedures, and the quality and integrity of the Company's
       financial statements and reports; (ii) the qualifications,
       independence, and performance of the registered public
       accounting firm or firms engaged as the Company's independent
       outside auditors for the purpose of preparing or issuing an audit

report or performing audit services (the "Auditors"); (iii) the review of any reports or other disclosure required by the applicable rules and regulations of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement and periodic reports within the scope of authority outlined herein; and (iv) the performance of the Company's internal audit function.

59.   The Audit Committee Charter further states that the Audit Committee shall "oversee the Company's financial reporting process on behalf of the Board, shall have direct responsibility for the appointment, compensation, retention, and oversight of the work of the Auditors and any other registered public accounting firm engaged for the purpose of performing other review or attest services for the Company."

60.   The Audit Committee Charter further states that the functions and responsibilities of the Audit Committee are, in relevant part:

***Audited Financial Statement Review; Quarterly and Annual Reports.***

To review the annual audited financial statements and quarterly financial statements with management and the independent auditors. The Committee will also review, upon completion of the audit or quarterly review by the Auditors, the financial statements proposed to be included in the Company's Annual Report on Form 10-K or any Quarterly Report on Form 10-Q to be filed with the SEC and any disclosure from the Company's chief executive officer and chief financial officer to be made in connection with the certification thereof, and to recommend whether or not such financial statements should be so included.

* * *

***Management's Discussion and Analysis***. To review with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

* * *

***Press Releases***. To review with management and the Auditors, to the extent appropriate, earnings press releases, as well as the substance of financial information, including "pro-forma" or "adjusted" nonGAAP information, and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The chairperson or a designee of the Committee may represent the entire Committee for purposes of these reviews.

* * *

***Risk Assessment and Management***. To review and discuss with management and the Auditors, as appropriate, the Company's guidelines and policies with respect to financial risk management and financial risk assessment, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures.

## IV.  SUBSTANTIVE ALLEGATIONS
### BACKGROUND

61.  Based in San Francisco, California, Stitch Fix's original business model was that customers paid a fee for a "subscription" and were sent a monthly "Fix" box. Inside this box would be five pieces curated by SFI's personalized

shoppers. While customers would fill out a "style quiz" and could request styles of outfits, the customer did not know what pieces would be in the box until it arrived. The customer could then choose which, if any, items to buy, and could return the rest. The customer paid a $20 "styling fee" per Fix, and that fee would be applied to any of the items the customer chose to buy.

62.   In or around 2019-2020, SFI also started a referrals program to reward existing customers who referred new customers. The program was costly but allowed SFI to inflate its "active user" numbers which precipitated higher stock prices.

63.   Prior to the Relevant Period, Stitch Fix announced a new direct-buy retail component, eventually named "Freestyle." According to SFI, the Freestyle program allowed both new customers and existing Fix subscribers to shop the site for specific products, giving the customer more control over what items they received, but also removing the curation element that differentiated Stitch Fix from other e-retailers.

64.   The Freestyle program was first made available in the United States to a subset of existing Stitch Fix customers in 2020, and incrementally rolled out to all existing customers in early 2021. In September 2021, the Freestyle program was formally launched to new customers.

65.   The Relevant Period begins after Stitch Fix issued a press release announcing the launch of its Freestyle, or direct buy, program.

66.   In the Freestyle press release, which was published after the market closed on December 7, 2020, and also filed with the SEC on Form 8-K, the Company described the Freestyle program as a way to "expand [its] addressable market, deepen client engagement and grow wallet share over time." Stitch Fix also claimed that Freestyle would "serve as another catalyst as we attract new clients, convert prospective clients and reactivate lapsed clients."

1

2     67.   Later on December 7, Stitch Fix held a conference call with analysts

3  and investors to discuss the Company's earnings and operations. Defendants

4  Spaulding, Lake and Smith were present and spoke. During that call, Defendant

5  Lake again stated that the Freestyle program "will serve as another catalyst as we

6  attract new clients, convert prospective clients and reactivate lapsed clients." In

7  addition, Defendant Lake highlighted the internal testing Stitch Fix was

8  undertaking in order to determine "the best way to introduce [Freestyle]" to

9  customers. Specifically, Defendant Lake explained "we've been doing some

10  testing around what is the best way to introduce [Freestyle] and what is the best

11  way for us to actually figure out like this is somebody who should be on a

12  conversion path to Fixes versus this is somebody that we actually should have

13  into a [Freestyle] first," and that the Company was "testing to make sure" it did

14  so correctly.

15     68.   Defendant Spaulding reiterated that the Company had "embarked on

16  our next form factor, [Freestyle], which we expect will expand our addressable

17  market, deepen client engagement and grow wallet share over time."

18     69.   In response to an analyst question regarding the combination of

19  Freestyle and Fix, Defendant Lake stated that "the two experiences are really

20  additive" and that "what we're finding is that these are actually, I think there is a

21  broader hypothesis that [Freestyle] and Fixes will allow us – the kind of

22  combination of those two things will allow us to address many more types of

23  clients."

24     70.   On February 10, 2021, Defendant Lake represented Stitch Fix at the

25  Goldman Sachs Technology & Internet Virtual Conference. At the conference,

26  Defendant Lake was asked "what is the vision for [Freestyle] and how has the

27  offering evolved over the last year or so since you started rolling it out?"

28

71. In response, Defendant Lake explained that Freestyle was "one of the most exciting things . . . it's one of those initiatives that is both really powerful and we can see in the data that it's working. And at the same time there's still so much opportunity. In addition, Defendant Lake again discussed the Company's internal testing, stating "we've experimented with different formats" and "we've started experimenting with kind of different form factors of what that experience could look like."

72. At the same conference, Defendant Lake was asked "one thing we hear a lot . . . is this perception that [Freestyle] means you end up looking like just a big shopping mall that sells everything within apparel." In response, Defendant Lake highlighted Freestyle's personalization, stating "when you look at our return rates we know it works. We are showing you things that are only relevant for you. They're not relevant for others. They're relevant for you. And that drives conversion. It drives product acceptance. It drives people loving it."

73. On March 8, 2021, Stitch Fix held a conference call with analysts and investors to discuss the Company's earnings and operations for its second quarter of 2021. Defendants Lake and Spaulding spoke. During that call, Defendant Lake stated that Freestyle was "resonating with our existing clients and we're preparing to roll it out to first-time clients at the end of fiscal" fourth quarter. On the same conference call, an analyst asked Defendant Spaulding "can you just talk about how you expect" the Freestyle roll out to first-time clients "potentially cannibalizing the existing Fix business?" In response, Defendant Spaulding responded that the Company was "seeing that is actually an additive experience" and agreed that "[Freestyle] is additive to the Fix business for our Fix customers, so we like what we're seeing there from an incrementality standpoint."

74. On June 7, 2021, Stitch Fix held a conference call with analysts and investors to discuss the Company's earnings and operations for its third quarter of

2021. Defendants Lake and Spaulding spoke. During that call, Defendant Lake stated that Stitch Fix was "embarking on our next growth horizon through our introduction of [Freestyle], which expands our ecosystem of experiences and opens up a total addressable market that we estimate to be multiple times larger than Fixes alone." In addition, Defendant Lake reiterated that "the success in incrementality that [Freestyle] has demonstrated to date gives us high conviction that our personalized shopping experience will significantly broaden the appeal and reach of Stitch Fix."

75.   Defendants' statements that Freestyle (sometimes referred to as "Direct Buy") was a "frictionless entry point" that would allow the Company to "attract new clients," "convert people," and expand the Company's addressable market were false and misleading, and omitted material facts. As corroborated by four former employees, repeated testing led by the Data Science or "Algorithms" group unequivocally demonstrated that new customers channeled to Direct Buy converted at rates 30-40% below traditional Fix clients and that those who did convert spent substantially less and were of lower quality than traditional Fix clients.

76.   "Cannibalization" refers to the fact that potential customers did not convert to Stitch Fix because they were onboarded into Direct Buy instead of Fix, or did convert through Direct Buy, but bought substantially less than they would have if they had been onboarded through Fix. As detailed below, at least three statistically significant tests of the Direct Buy experience run on new clients by Stitch Fix's own Data Science group confirmed that Direct Buy was cannibalistic, converting 30-40% less new clients than Fix, and attracting lower-quality shoppers that were worth substantially less and had lower lifetime values than new clients who converted through Fix.

77.   According to the allegations in the Securities Class Action Complaint, Former Employee ("FE") 1[1] was a Senior Manager, Product Marketing at Stitch Fix from July 2019 until April 2021, who was based in the Company's San Francisco office and reported to Neha Masson and later Betsy Dobbin. FE 1 personally worked on the Direct Buy launch, and he confirmed that the Company's test results showed that Direct Buy was cannibalistic. Following this Court's Order on the Motion to Dismiss, Lead Counsel recontacted and reinterviewed FE 1 to obtain more details on the specifics of Stitch Fix's internal tests.

78.   According to FE 1, multiple internal tests were done before he left the Company in April 2021 to understand whether Direct Buy would attract new clients, and those test results were very bad. FE 1 learned about these negative test results in February or March 2021 because he was in meetings in which the negative test results came up, and he also heard about it from colleagues. FE 1 confirmed that in February or March 2021, there were very clear test results and the recommendation from Data Science was that Stitch Fix was not ready and the tests did not look good. FE 1 explained that the Data Science team at Stitch Fix ran a test that they referred to internally as the "New Fix Customer Test." According to FE 1, through the New Fix Customer Test, the Data Science team would use their framework and methodology around multi-variant testing to model out what completion looked like through the onboarding function. FE 1 confirmed that they understood from the New Fix Customer Test that Direct Buy was going to negatively impact customer acquisition. Specifically, according to FE 1, the Company's onboarding process would sacrifice customers who came in

---

[1] The terms and references to "Former Employees" and "FE" refer to the former employees of Stitch Fix whose reports are discussed in the Securities Class Action Complaint.

for a Fix, were funneled to Direct Buy, and then ultimately did not make a purchase or they bought less. FE 1 explained that the Direct Buy customers were converting at a lower rate, or they would spend less money, compared to Fix customers.

79.  the Securities Class Action Complaint, FE 1 further described that the "New Fix Customer Test" was designed because Stitch Fix needed to test and understand how Direct Buy would impact new customers and new customer onboarding. FE 1 stated that the Company viewed "cannibalization" as an onboarding problem: if potential Direct Buy customers bought less or no products from Stitch Fix, the Company would not be able to win those potential customers back, so Direct Buy would "cannibalize our potential for new customers" who would have converted to Stitch Fix or purchased more through the Fix experience.

80.  With respect to the timing of the New Fix Customer Test, the Securities Class Action Complaint states FE 1 confirmed the "Trending for You" offering that the Company said it introduced in early June 2020 was the Direct Buy experience. FE 1 further confirmed that the New Fix Customer Test first occurring in June 2020 was consistent with his recollection, and that the "Trending For You" "beta" that the Company discussed on June 8, 2020 (excerpted below) was tested as part of the New Fix Customer Test:

> And in an effort to move Direct Buy closer to becoming a client acquisition vehicle, in early June, we introduced a beta for our new offering. This new offering, which we call Trending for You, removes the purchase item requirement and instead allows men's and women's clients to shop hyper-personalized looks based on their style profile.

81.   In the Securities Class Action Complaint, FE 1 explained how the New Fix Customer Test operated, including who the test tested and what the test entailed (i.e., what its parameters were). FE 1 described how the test had two groups: a control group and an experiment or treatment group. According to FE 1, half the people who came in would go to the normal Stitch Fix landing page for the Fix (control group), while the other half would see Direct Buy as an onboarding path (treatment group). The treatment group filled out a style profile, but would see different visuals and would be asked different questions, and then would be shown a personalized Shop where they could purchase items directly. The control group, on the other hand, was directed to the standard Fix process, in which they fill out a profile and could then schedule their Fix.

82.   The Securities Class Action Complaint alleged that FE 1 confirmed that the New Fix Customer Test was conducted on new clients, individuals who had not previously ordered a Fix. Selection for the control and treatment groups was randomized. FE 1 clarified the distinction between "net new" clients—which refers to people who have never purchased from Stitch Fix, signed up for an account, or filled out a profile—and "signed-up prospects"—which refers to people who had signed up for an account and filled out a profile, but never scheduled a Fix or made a purchase. According to FE 1, the Company conducted this testing on people who had not purchased anything in the past; therefore, the New Fix Customer Test included and did not differentiate between "net new" clients and "signed-up prospects." FE 1's account is corroborated by Defendant Spaulding's explanation on December 7, 2021 that "signed-up prospects" over 12 months old "behave like pure new prospects."

83.   The Securities Class Action Complaint alleged that FE 1 further confirmed that the New Fix Customer Test showed that Direct Buy was going to negatively impact customer acquisition. FE 1 explained that the tests evaluated

two metrics: lifetime customer value and annual customer value. FE 1 described how, based on a Fix customer's spending habits (i.e., averaging a certain number of purchases per Fix, and scheduling a certain cadence of Fix shipments), the Company can calculate how much they anticipate the customer will spend in a year and in their lifetime. FE 1 confirmed that the test showed that the New Fix Customer Test treatment group (Direct Buy-first) purchased less, and were less likely to return, than the control group (Fix-first). FE 1's understanding was that many treatment condition customers purchased nothing.

84.    Further, the Securities Class Action Complaint alleged FE 1 corroborated FE 4's (defined below) account that the New Fix Customer Test treatment group's conversion rate to becoming Stitch Fix customers was about 30-40% lower than the control group, and further confirmed that the test was showing that people who were funneled to Direct Buy first in the experience were purchasing less or purchasing nothing. FE 1 explained that the Fix experience is a subscription that schedules periodic recurring Fix deliveries. Direct Buy, on the other hand, is just a personalized digital store; consequently, many customers would buy a small handful of items and not return.

85.    In short, according to FE 1 in the Securities Class Action Complaint, the New Fix Custom Test showed that potential clients onboarded through Direct Buy converted about 30-40% less, and that clients who did  become Direct Buy customers purchased less than Fix customers and were less likely to purchase from the Company again. FE 1 confirmed that the New Fix Customer Test showed cannibalization as Direct Buy-first prospective customers did not convert at all or bought less and returned to Stitch Fix less frequently than Fix-first customers.

86.    FE 1 further confirmed in the Securities Class Action Complaint alleged that the New Fix Customer Test's results were statistically significant.

Because the volume of traffic to the website is so high, the test was conducted on less than 10% of website visitors. FE 1 assured that this was still enough of a sample size to achieve statistical significance. FE 1 explained that Stitch Fix typically ran its tests this way because they did not know the revenue implications of the experiment, so the Company isolates the test to a small enough amount of traffic to avoid any effect on revenue, but includes a large enough sample to reach statistical significance. FE 1 explained that Data Science knows how many people to include in the test and how long to run the test in order to achieve statistical significance.

87.    By way of example, FE 1 said that if one million customers used the site during the test period, the Company may say it only wants 10% involved in the test. FE 1 explained that there would then be 100,000 new customers in the experiment, half of which would get the control treatment and half of which would get the experiment treatment. FE 1 reiterated that the New Fix Customer Test achieved statistical significance. FE 1 further explained that at Stitch Fix, if you do not have statistical significance, the test is null and not valid. FE 1 confirmed that the New Fix Customer Test was valid.

88.    With respect to how the test results were quantified and presented to the Defendants, the Securities Class Action Complaint alleged FE 1 confirmed that Defendant Spaulding knew about the results of all the tests. According to FE 1, the Data Science team put together Google Slides decks compiling the details and results of all the tests and showing the standard operating process of how Data Science ran these tests, including descriptions of the test population figures, the control group, and the Direct Buy group. FE 1 confirmed that the Google Slides decks included actual data, not just the headline result showing that the Direct Buy group converted at a lower rate than the control (Fix) group. FE 1 explained that there was a chart that showed the results of the groups, comparing

them side by side with the major data points, such as the conversion rate of the control group and the conversion rate of the experiment group. FE 1 confirmed that the conclusion itself was also displayed on multiple slides as well. For example, a slide would say that "the test result is that Shop [i.e., Direct Buy] is not successful." FE 1 specifically recalled the slides saying something to the effect of "Direct Buy performed poorly relative to the Fix, and therefore we do not recommend moving forward with this." FE 1 confirmed that the data scientists did not recommend moving forward with Direct Buy.

89.    FE 1 further confirmed that these decks were reviewed in weekly meetings with Defendant Spaulding. Indeed, FE 1 explained, the entire purpose of those weekly meetings was to inform Defendant Spaulding of the tests and the status moving forward. In addition to Defendant Spaulding, the primary people in these weekly meetings were the lead on the Data Science team who was responsible for the test, some others from Data Science, Product Managers who were focused on Direct Buy, the Strategy team, and the Strategy lead. FE 1 recalled that the weekly meetings were called the "Weekly Direct Buy Meetings" or "Weekly Direct Buy Testing Meetings." They were also called "share-out" meetings, consistent with the purpose of the meetings, which was to share where they were with the current test results and where they were with decisions that needed to be made with respect to experiments. FE 1 worked directly with Shubhi Jain in Data Science who attended the Weekly Direct Buy Testing Meetings, along with his manager. FE 1 confirmed that there was cannibalization testing that was done on Direct Buy for the specific purpose of updating senior management, and the results were presented in those Weekly Direct Buy Testing Meetings.

90.    FE 1 further explained that the format of these meetings is that the lead for the Data Science team presents test results to leadership and would

explain what the test revealed, test performance, lessons learned, and recommendations. FE 1 reiterated that here, the recommendation was to not move forward with Direct Buy because it performed poorly compared to the Fix experience. FE 1 confirmed that this would be presented and communicated to Defendant Spaulding.

91.   FE 4 was a Data Scientist at Stitch Fix from July 2020 through July 2023, who was promoted to Data Scientist Manager in April 2021, and then in September 2022 became a Data Scientist for Pricing Optimization until leaving the Company. FE 4 confirmed that the Company was testing the impact of Freestyle on new customer conversion to the Fix business. As FE 4 explained, the initial idea was that Freestyle would be a new avenue for growth supplementing the existing Fix business because Stitch Fix's growth was flat or flattening when FE 4 joined the Company. FE 4 confirmed that the hope was that Freestyle would attract new clients and lead to growth, and therefore new clients were the focus of Stitch Fix's testing.

92.   FE 4 confirmed FE 1's description of the testing methodology. FE 4 explained that the Company conducted experiments in which, typically, half of Stitch Fix website visitors would be in the experiment group and directed to Freestyle first, and half would be in the control group and directed to Fix first. FE 4 confirmed that these tests were conducted by the Data Science group, which was called the "Algorithms group" internally. FE 4 further confirmed that experiments were conducted in which some of the people who came onto the Stitch Fix website would be directed to Freestyle first as the experiment group and some of the people would go toFix first as the control group.

93.   FE 4 also confirmed what FE 1 stated regarding the test populations and statistical significance. FE 4 confirmed that the populations in the tests would all be new clients, meaning people who had never ordered a Fix before. FE 4

stated that the populations in the tests were certainly large enough to have high confidence in the results.

94.   According to FE 4, multiple tests were conducted by the Data Scientists in the Algorithms group and they all showed that if a person who came to the Stitch Fix website was directed to Freestyle first instead of Fix, the conversion rate—or rate at which people became Stitch Fix customers—would drop 30-40%. For example, FE 4 explained, if nothing else changes in the world and Stitch Fix gets 100 new clients per day with the control experience, they would expect to see that the Freestyle-first experience would lead to only 70 new clients per day. FE 4 learned this from his fellow data scientists who were conducting the tests.

95.   FE 4 further confirmed that there were at least three tests conducted: the first test was conducted in summer 2020, and then additional tests were conducted in 2020 and early 2021. The tests consistently showed that Freestyle-first customers converted 30-40% less frequently to Fixes than Fix-first customers. Again, FE 4's understanding of the tests and their results was based on his discussions with the data scientists who were conducting the tests.

96.   FE 4 further confirmed that with an effect as large as 30-40%, you do not really need a big population to find out if there is an effect. FE 4 explained that 30-40% was the mean over the course of a few experiments—one test might have an average of 30% and one might have an average of 40%. According to FE 4, error bars may be plus or minus 10%. FE 4's understanding is that with a percentage as large as 30-40% impact on conversion rate if the client was sent to Freestyle first (as these tests had), the Company had confidence that it was a substantially meaningful effect. FE 4 explained the results by confirming that typically, a Freestyle client is "one and done" and does not have as high of a lifetime value as a Fix customer.

97.   With regard to the test results, FE 4 explained that the experiments were running through the A/B randomization system, and the results were written into the A/B database as they came in. According to FE 4, once the analysis was completed through the A/B interface, it would be pasted into a Google Docs or Google Slides presentation. FE 4 explained that additional analysis beyond what the standard A/B interface would do may be run after that, and those results would go into the Google Docs/Slides presentation as well. FE 4 confirmed that it is his understanding that Defendant Spaulding had access to those Google Slides presentations in which the results of those tests were quantified and knew about them.

98.   FE 4 explained that the executive suite, including Defendant Spaulding and her direct reports, were informed of the results of these tests. He described how within Data Science, there was very clearly the opinion of "this is not going to work." FE 4 confirmed that the message that "we should not do this" was very clear in Data Science, meaning they should not launch Freestyle to new customers because it was going to hurt the Fix conversion rate. According to FE 4, anyone who had the nerve to stand up and say that was treated very poorly by Spaulding until they were quiet or left the Company.

99.   Additional former employees interviewed by Lead Counsel confirmed that the Company's internal tests showed that Direct Buy was cannibalizing Fix customers, and that those results were shared with senior management, including the Executive Defendants. FE 2, Director, Men's Apparel Design: Using Data Science & Analytics to Drive Design at Stitch Fix from October 2017 until June 2022 who reported to the Senior Director of Merchandise, Brandon Kettle, joined the Direct Buy team in July or August 2020. Since FE 2 approached design from a data standpoint, he had a lot of interaction with data scientists in his role at the

Company. After the Court's Motion to Dismiss Order, Lead Counsel recontacted and re-interviewed FE 2 and FE 2 provided additional details about the testing.

100. According to FE 2, when Stitch Fix launched the initial beta test for Freestyle, the test was going to run for two weeks and after the two weeks, it had failed. FE 2 explained that the Company's business model was based on shipping Fixes. According to FE 2, the purpose of the testing was to determine whether Fix and Freestyle could exist as independent revenue streams, or if they would overlap. Stitch Fix did not want Freestyle to overtake Fix or Fix to overtake Freestyle.

101. FE 2 confirmed that the purpose of the tests he discussed was to determine whether Freestyle was going to bring in more clients and new revenues, or if it would cannibalize the existing Stitch Fix business by taking would-be Fix customers away from Fix. According to FE 2, the main question was whether Freestyle was going to be additive to Fix. FE 2 confirmed that the testing he was informed of was to determine whether Direct Buy was going to cannibalize Fix across Men's and Women's attire; it was looking at Direct Buy across adults in general.

102. FE 2 further confirmed that there was a second beta test that occurred while he was on the Direct Buy team, which he joined in July or August 2020. FE 2 explained that the Product team and Data Science team ran the cannibalization tests, and FE 2 knew that those teams had an internal goal for what successful metrics would look like, looking at issues like conversion, which the test did not meet. The metric was complicated and involved analysis of multiple data points. FE 2 confirmed that, despite the test failing to hit its success metric due to cannibalization, a decision was made to push forward with Direct Buy anyway.

103. Confirming what FE 1 said, FE 2 explained that lifetime value was a metric that was talked about a lot once Spaulding came in. FE 2 explained that

there was a lot of talk about customer acquisition, and it was known that new customers will not be valuable within their first year in the funnel. According to FE 2, there were a lot of conversations about this. FE 2 also recalled a lot of talk about churn and how long people were staying in the model; that was a number they cared about a lot.

104. FE 2 also confirmed what FE 1 stated above regarding the existence of a standing Freestyle touch base meeting every Friday attended by senior management. FE 2 understood that the results of the tests were shown to Defendant Spaulding at that meeting. Early the next week, FE 2 personally found out the results of the tests and that Stitch Fix was nonetheless pushing forward with launching Direct Buy to new customers. Specifically, FE 2 personally attended weekly standing meetings run by the Product Management team that included a group of 7-15 people. During one of these meetings, he learned from a data scientist named Rajeev Jain, who worked on the Direct Buy beta test, that the beta test failed.

105. As noted, Lead Counsel re-interviewed FE 2 in August 2024. FE 2 reconfirmed that there were weekly standing meetings that the Product Management team had with "MGMT," which included Defendant Spaulding and Company CFO Dan Jedda, that occurred on Friday mornings. FE 2 also reconfirmed that he had found out about the failed cannibalization test verbally during an afternoon Zoom meeting.

106. FE 2 had concerns that the beta tests would not go well and would hurt the Company's brand, and he discussed those concerns with the head of Freestyle, Lindsay Ferstandig; Jenny Herr, the Women's trends manager at Stitch Fix; his boss, Kettle; the General Manager of Kids' Merchandise, Carla Feely; the product manager, Allison Barrow; and the Vice President of Women's Merchandise, Samara Fetto-Gee. FE 2 explained that in his role, he had

familiarity with the data set that the data scientists were using to test Freestyle. FE 2 confirmed that the data points that the data scientists collected from Freestyle and the data points they collected from Fix did not line up. FE 2 explained that this data inconsistency presented multiple red flags. Drawing from his graphic design background, he created a presentation showing that this was a problem and he told his direct managers to share it with the C-suite.

107. FE 2 confirmed that cannibalization was a big topic of conversation at Stitch Fix. FE 2 further confirmed that it was clear internally that the initial beta test was a failure. There was a second test shortly after the initial beta test which was either inconclusive or failed as well. According to FE 2, the tests conducted prior to the launch of Freestyle had failed, and the launch was moving forward anyway.

108. FE 2 explained that he was emotionally invested in the outcome of the second beta test conducted on Direct Buy that he had previously described, supra at ¶¶70-75, and every day he heard that the test results indicated failure. FE 2 confirmed that this testing was conducted on his workflow (Shop Your Looks, Shop by Color, and Shop by Category). FE 2 recalled employees asking how they could improve Direct Buy, and they were shocked when they heard the Company was moving forward with it anyway.

109. FE 3, a former Data Scientist at Stitch Fix from June 2020 until June 2021 who was responsible for developing one variant of the algorithms used to recommend clothes to customers, confirmed that there were team meetings with data scientists in which cannibalization was discussed. FE 3 heard his fellow data scientists observing that it was obvious from test results as well as continuous customer research conversations that Freestyle was taking customers away from the Company's existing Fix business.

110. FE 3 confirmed that there were routine meetings happening between data scientists and executive leadership, including Defendant Spaulding, regarding the performance of Freestyle. He further confirmed that he received weekly email blasts containing relevant data, which he specifically described as top line revenue numbers and breakdowns by customer category as well as Freestyle versus Fix. The format of this information was similar to an Excel file. According to FE 3, trends concerning new customer acquisition and customer retention in regard to Freestyle would be reflected in those reports. FE 3 confirmed that these weekly email blasts went to Defendant Spaulding and Defendant Lake. He further confirmed that Defendants Spaulding and Lake had the ability to access data concerning the cannibalization of Fix by Freestyle through the data scientists.

111. Despite statistically significant test results confirming that Direct Buy cannibalized Fix by decreasing new client conversion and attracting low quality clients, Defendants continued to tell investors that Direct Buy was, and would continue to attract "high-quality" new clients, "convert" prospective clients, and be "frictionless" with Fix. For example, during the Company's earnings call for its first fiscal quarter of 2021, held on December 7, 2020, Defendant Spaulding said that "our ongoing momentum in direct buy" will allow the Company to "attract high-quality clients, but also to convert our large prospect population that we estimate is in the millions, clients who are at the precipice, but have not yet converted to Stitch Fix." This statement was repeated in the Company's shareholder letter, released the same day. During the same call, Defendant Lake reiterated in response to an analyst question about trends with respect to "new customers," that "what we're seeing is that the two experiences are really additive" and Direct Buy was a "great way" to buy products in a "frictionless way."

112. Defendants continued to cite the Company's own internal test results as the basis for these statements. For instance, on the December 7, 2020 call, Defendant Spaulding was asked for "more insight into the plan to introduce Direct Buy to prospective clients later this year." She responded that the Company was "experiment[ing] with a new sort of introduction and onboarding flow into Stitch Fix" to accommodate the influx of new customers. She explained that the Company was "in the flight of building and testing right now," and "we're always testing things," and they were "beginning to experiment with our prospective client base with our direct buy offering." On the same call, Defendant Lake directly said, in response to a question about what factors the Company would consider in determining when to fully launch Direct Buy to new customers, that "we've been doing some testing around what is the best way to introduce direct buy and like what is the best way for us to actually figure out like this is somebody who should be on a conversion path to Fixes versus this is somebody that we actually should have into a direct buy first."

113. On September 21, 2021, Stitch Fix held a conference call with analysts and investors to discuss the Company's earnings and operations for its fourth quarter of 2021. On that conference call, an analyst stated that "in the past you've talked about low cannibalization, but I'm curious to get the updated thoughts." Defendant Spaulding responded as to the "specific cannibalization question, maybe two thoughts to offer. One is just we think that revenue per active client that we shared and the knowledge that we have of like the new cohorts of clients is the real strength and incrementality of these two offerings really being quite complementary." Defendant Spaulding went on to say, "I think we see solid growth in both sides of the business in the coming year."

114. The statements and omissions set forth above were materially false and misleading. In truth, throughout the Relevant Period, Stitch Fix concealed the

fact that these programs were not complementary or additive. Stitch Fix knew that the Freestyle program would be much preferred to the Company's original Fix model, and that the Freestyle program would inevitably cannibalize the Company's legacy Fix business.

115. Contrary to Defendants' representations to investors that Direct Buy and Fix were "highly additive," "complementar[]y," and "clear[ly] incremental[]," an outside investigation has revealed the Company's internal tests were negative and revealed that Direct Buy was cannibalizing the Fix business. For instance, as uncovered by counsel in the Class Action, a former Stitch Fix employee, who was a Manager, Product Marketing at Stitch Fix from July 2019 until April 2021, and based in the Company's San Francisco office and reported to Neha Masson and later Betsy Dobbin. This former employee personally worked on the Direct Buy launch, and he confirmed that the Company's test results showed that Direct Buy was cannibalistic.

116. The Securities Class Action Complaint alleged that according to this former employee, multiple internal tests were done before he left the Company in April 2021 to understand whether Direct Buy would attract new clients, and those test results were very bad.

117. Contrary to Defendants' representations to investors that Direct Buy and Fix were "incremental" and "additive," each of the Company's internal tests through March of 2021 unequivocally established that Direct Buy cannibalized the Fix business, reducing conversion rates by 30-40% and attracting lower quality clients.

118. As discussed in depth above, in the Securities Class Action Complaint FE 1 explained that he learned about negative test results from the New Fix Customer Test in February or March 2021 showing cannibalization. By the time FE 1 left the Company in March 2021, FE 1 was not aware of any testing

suggesting that Direct Buy would work. FE 1 confirmed that it is his understanding that the test results were consistently negative from the summer of 2020 until he left the Company. FE 1 was not aware of any positive tests. FE 4 corroborated what FE 1 said. FE 4 explained that multiple tests were conducted by the Data Scientists in the Algorithms group and they all showed a 30-40% decrease in conversion to the Fix business if custers were directed to Freestyle first.  FE 4 further confirmed that there were at least three tests conducted: the first test was conducted in summer 2020, and then additional tests were conducted in 2020 and early 2021. These tests showed the 30-40% conversion rate drop, which FE 1 corroborated. FE 4 also confirmed that the Freestyle program that was eventually launched was absolutely fundamentally the same as the program that failed the testing. Similarly, FE 2, who joined the Direct Buy team in July or August 2020 and left the Company in June 2022, confirmed that he was not aware of any tests showing that there was no cannibalization or any cannibalization test showing a positive result while he was at the Company.

119. On April 13, 2021, the Company announced that effective August 1, 2021, Defendant Spaulding would be elevated to CEO, as Defendant Lake transitioned to the role of Executive Chairperson. In the press release announcing the transition, the Company stated that "Spaulding is focused on driving the next phase of the company's growth, including the expansion of the next generation of consumer shopping experiences[.]"

120. Analysts interpreted Defendant Spaulding's promotion as further confirmation that Direct Buy was and would continue to be successful. For instance, Truist Securities wrote on April 13, 2021 that Defendant Spaulding "had a positive impact on the company's operations since joining" by "continuing to push for the Direct Buy roll out[.]" Deutsche Bank Research wrote

on the same day that "[s]ince she joined the company, we believe Ms. Spaulding has been the driving force behind expanding Direct Buy[.]"

121. Defendant Spaulding personally acknowledged that she was brought in to lead this "second founding of the Company." For instance, during a May 3, 2021 interview with Bloomberg, Defendant Spaulding stated that she intended to bring about "transformative change" at Stitch Fix, and that companies like Stitch Fix need to "change or die." Indeed, Defendant Spaulding compared Stitch Fix's "shopping feed and that shop experience" to "moving from . . . our DVD era into the streaming era."

**J. Defendants' Summer 2021 Testing Continues To Confirm That Direct Buy Is Cannibalistic As Defendants Continue To Falsely Assure Investors That It Is "Incremental" To Fix And Promise To Launch By The End Of The Quarter**

122. In stark contrast to Defendants' rosy statements to investors, Defendants' testing during the summer of 2021 confirmed that Direct Buy was continuing to cannibalize the Fix business. For instance, FE 3 (a former Data Scientist at Stitch Fix) confirmed that by June 2021, there was a clear trend that customer acquisition was dropping and it was the largest source of conversation within Stitch Fix that Freestyle was cannibalizing Fix. Similarly, FE 2, who joined the Direct Buy team in July or August 2020 and left the Company in June 2022, confirmed that he was not aware of any tests showing that there was no cannibalization or any cannibalization test showing a positive result while he was at the Company. FE 4, who did not leave the Company until July 2023, confirmed that multiple tests were conducted by the Data Scientists in the Algorithms group and they all showed a 30-40% decrease in conversion to the Fix business if customers were directed to Freestyle first.

123. Despite knowing from their internal tests that Direct Buy was cannibalistic, Defendants continued to tell the market the opposite. For instance, on June 7, 2021, Stitch Fix held a conference call with analysts and investors to discuss the Company's earnings and operations for its third fiscal quarter of 2021. During that call, Defendant Lake stated that "[t]he success in incrementality that Direct Buy has demonstrated to date gives us high conviction that our personalized shopping experience will significantly broaden the appeal and reach of Stitch Fix."

124. During the same call, Defendant Spaulding explained that in March 2021, the Company had launched the fourth phase of Direct Buy, Shop By Category, to existing customers.  Defendant Lake also confirmed that, following the previous quarter's delay announcement, Defendants would fully "introduce direct buy to new clients by the end of the quarter."

125. FE 4 confirmed what FE 1 said above, that typically, a Freestyle client is "one and done" and does not have as high of a lifetime value as a Fix customer. FE 4 explained that a year after launch, FE 4 supervised someone who looked at how the lifetime value of the two compared. FE 4 explained that people who came in as a Freestyle first customer had less than half of the lifetime value a Fix first client had overall.

126. FE 4 recalled that before one of his colleagues left Stitch Fix in 2022, he remarked to FE 4, "I'm really excited to see our data testing database get subpoenaed" because all the data is there. FE 4 explained that this comment was made when lawsuits against the Company came up. FE 4's colleague said that they would love to see the data go into evidence because "it very clearly demonstrated that the people in charge knew what was going to happen." As FE 4 explained, "They had no reason to be surprised" that conversion on Stitch Fix

was going to go down rapidly when they implemented Freestyle. FE 4 confirmed that the database that has the test results in it is named "A/B."

127. This former employee learned about these negative test results in February or March 2021 because he was in meetings in which the negative test results came up, and he also heard about it from co-workers.

## FALSE AND MISLEADING SEC FILINGS

### September 27, 2021 10-K

128. On September 27, 2021, almost nine months after launching and tracking Freestyle, Stitch Fix filed its annual report on Form 10-K (the "2021 Form 10-K") for its fiscal year ending July 31, 2021. The 2021 Form 10-K was signed by Defendants Spaulding, Anderson, Gurley, Hansen, Lake, Lynch, McCollam, Mohan, Smith, Svane, and Williams.

129. The 2021 Form 10-K stated "In addition, we seek to attract new clients by offering new products, services, and ways to engage with our platform, such as our Freestyle offering. If such new products or services are not timely launched or are not successful in attracting new clients, our revenue growth and results of operations may suffer. Moreover, new clients may not purchase from us as frequently or spend as much with us as existing clients, and the revenue generated from new clients may not be as high as the revenue generated from our existing clients. These factors may harm our growth prospects and our business could be adversely affected."

130. On September 27, 2021, the Company filed its annual report on Form 10-K with the SEC. Within the annual report, the Company detailed the importance of its consumer profiles, which clients had historically been required to fill out prior to receiving Stitch Fix services. These profiles provided the Company with "over 100 meaningful data points," allowed for algorithmic

recommendations to drive engagement, and allowed the Company to "introduce [itself] to a client, initiate a dialogue, and start gathering data."

131. These statements were false or misleading because it did not fully and adequately advise that the Company did not foresee and project successful Freestyle customer and revenue metrics as evidenced by test results proving the freestyle program was losing Stitch Fix customers, the Company misrepresented the strength of the Freestyle program or downplayed its failure as evidenced by test results proving the freestyle program was losing Stitch Fix customers, the Company "had never onboarded clients directly into Freestyle,"[2] as later conceded by Defendant Spaulding, and the Company failed to maintain adequate internal controls.

132. The 2021 Form 10- K also stated "[w]e had 4,165,000 and 3,522,000 active clients as of July 31, 2021, and August 1, 2020, respectively, representing year-over-year growth of 18.3%."

133. This statement was at a minimum materially misleading and omitted material facts.  Having chosen to tout growth in active clients and net active clients, the Company was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations, including, as the Company ultimately acknowledged, that Defendants' internal test results showed that the Direct Buy or freestyle program was losing Stitch Fix customers.

**November 4, 2021 Proxy Statement**

134. In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants in the 2021 Form 10-K, the

---

[2] Stitch Fix: Too Prudent For Its Own Good, Stone Fox Capital, December 13, 2021 (https://seekingalpha.com/article/4474888-stitch-fix-too-prudent-for-its-own-good)

Individual Defendants caused the Company to issue a false and misleading Proxy Statement (the "2021 Proxy") on November 4, 2021.

135. Defendants Anderson, Gurley, Hansen, Lake, Lynch, McCollam, Mohan, Smith, Spaulding, Svane, and Williams solicited the Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

136. The 2021 Proxy stated:

**THE BOARD OF DIRECTORS RECOMMENDS**
**A VOTE FOR EACH NOMINEE NAMED ABOVE.**

137. The nominees recommended by the board included Individual Defendants Lake, McCollam, and Williams.

138. The 2021 Proxy assured stockholders that the Board and its committees regularly assessed and managed the risks that Stitch Fix faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans. Specifically, the 2021 Proxy stated:

**Role of the Board in Risk Oversight**

One of the Board's key functions is informed oversight of the Company's risk management process. The Board does not have a standing risk management committee, but administers this oversight function directly through the Board as a whole, as well as through various standing Board committees that address risks inherent in their respective areas of oversight. In particular, our Board is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for the Company. Our Audit Committee has the responsibility to oversee the Company's enterprise risk management program, including cybersecurity risks; to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken; to monitor compliance with legal and regulatory requirements; and to oversee the performance of our internal audit function. Our Nominating and Corporate Governance Committee oversees and reviews with management the Company's

major governance risk exposures and the steps management has taken to monitor or mitigate such exposures, including our procedures and any related policies with respect to risk assessment and risk management, as well as our governance structure and Board succession risks. Our Compensation Committee reviews our compensation practices and policies as they relate to risk management and risk-taking incentives, to determine whether such compensation policies and practices are reasonably likely to have a material adverse effect on the Company, and monitors and oversees efforts to mitigate management succession risks. The entire Board meets with senior management periodically, and the applicable Board committees meet periodically with the employees responsible for risk management in the committees' respective areas of oversight. Both the Board as a whole and the various standing committees receive periodic reports from employees responsible for risk management, as well as incidental reports as matters may arise. It is the responsibility of the committee chairs to report findings regarding material risk exposures to the Board as quickly as possible.

139. The 2021 proxy also stated:

**Audit Committee**

The Audit Committee of the Board was established by the Board in accordance with Section 3(a)(58)(A) of the Exchange Act to oversee the Company's corporate accounting and financial reporting processes and audits of its financial statements. Our Board has determined that Ms. McCollam and Ms. Williams are "audit committee financial experts" within the meaning of SEC regulations. Each member of our Audit Committee can read and understand fundamental financial statements in accordance with applicable requirements. In arriving at these determinations, our Board has examined each Audit Committee member's scope of experience and the nature of their employment in the corporate finance sector.

The primary functions of this committee include:

- helping our Board oversee our corporate accounting and financial reporting processes;
- managing the selection, engagement, qualifications, independence, and performance of a qualified firm to serve as the independent registered public accounting firm to audit our financial statements;
- discussing the scope and results of the audit with the independent registered public accounting firm and reviewing, with management and the independent

accountants, our interim and year-end operating results; reviewing our cybersecurity policies and programs;

- developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;
- reviewing related-party transactions;
- reviewing the effectiveness of the Company's internal controls over financial reporting, any material issues with such controls, and any steps taken to address such issues; and
- approving or, as permitted, pre-approving, audit and permissible non-audit services to be performed by the independent registered public accounting firm.

The Board reviews the Nasdaq listing standards definition of independence for audit committee members on an annual basis and has determined that all members of the Company's Audit Committee are independent (as independence is currently defined in Rule 5605(c)(2)(A)(i) and (ii) of the Nasdaq listing standards).

**Report of the Audit Committee of the Board\***

The Audit Committee has reviewed and discussed the audited financial statements for the fiscal year ended July 31, 2021, with management of the Company. The Audit Committee has discussed with Deloitte & Touche LLP, the Company's independent registered public accounting firm, the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board ("PCAOB"), including Auditing Standard No. 1301, *Communications with Audit Committees,* as adopted by the PCAOB, and the SEC. The Audit Committee has also received the written disclosures and the letter from Deloitte & Touche LLP required by applicable requirements of the PCAOB regarding Deloitte & Touche LLP's communications with the audit committee concerning independence and has discussed with Deloitte & Touche LLP the firm's independence. Based on the foregoing, the Audit Committee has recommended to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended July 31, 2021.

140. The Individual Defendants caused the 2021 Proxy statement to be false and misleading because they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make

false and misleading statements to the investing public that failed to disclose, *inter alia,* that that Company did not foresee and project successful Freestyle customer and revenue metrics as evidenced by test results proving the freestyle program was losing Stitch Fix customers, the Company misrepresented the strength of the Freestyle program or downplayed its failure as evidenced by test results proving the freestyle program was losing Stitch Fix customers, , the Company "had never onboarded clients directly into Freestyle," as later conceded by Defendant Spaulding, and the Company failed to maintain adequate internal controls.

141. As a result of the materially false and misleading statements in the 2023 Proxy, the Company's stockholder vote requested by the proxy was uninformed.

## STITCH FIX UNRAVELS

142. On December 7, 2021, just three months after the November 2021 Proxy, Stitch Fix announced a loss for its first quarter of 2022 and cut its full-year revenue projections. That same day, during a conference call with analysts and investors to discuss the Company's earnings and operations for its first quarter, Stitch Fix admitted for the first time that, as a result of the "expansion into Freestyle" the Company "may experience short-term impacts of cannibalization."

143. On December 7, 2021 in their Q-1 earnings conference call with analysts, Defendant Spaulding admitted that: SFI's "sequential net client additions were lower than prior quarters;" contrary to prior statements, SFI was "in a major learning phase" as we build out our new Freestyle experience;" SFI "experienced lower fixed conversion rates than we expected."

144. In December 2021, Spaulding admitted that "only a fraction of our new [Freestyle] traffic completed the [Fix] profile." Specifically, Defendant

Spaulding stated that "the short-term cannibalization that I was referring to is more as we think about onboarding new customers to our experience."

145. As a result of this disclosure, the price of Stitch Fix stock declined by $5.97 per share, or 24%, from a closing price of $24.97 per share on December 7, 2021, to a closing price of $19.00 per share on December 8, 2021.

146. However, Stitch Fix continued to assure investors that this was a short-term problem. For example, on the December 7, 2021, conference call, Defendant Spaulding explained that Stitch Fix had "been testing client onboarding flows" and that "we see significant new client potential ahead as Freestyle enables us to access a greater share of shopping occasions." In addition, Defendant Spaulding stated, "one key area of investment is reducing friction for new clients to access freestyle through testing new onboarding approaches."

147. The statements and omissions set forth above were materially false and misleading. In truth, Stitch Fix continued to conceal the fact that these programs were not complementary or additive. Stitch Fix knew that the Freestyle program would be much preferred to the Company's original Fix model, and that the Freestyle program would inevitably cannibalize the Company's legacy Fix business.

148. In the quarter ended January 2022, SFI was buying stock in the market as Defendants were selling into SFI's buyback program.

149. In March 2022, Defendants admitted that the weak results of the half year ended January 2022 did not improve in the next month.

150. It was not until March 2022 that Defendants admitted how "impactful" the IOS privacy charges had been because SFI had been unable to find alternative marketing challenges.

151. Confirming that investors were misled by Defendants' statements, at the March 2022 earnings conference call, an analyst at UBS expressed surprise at

the loss of 161,000 customers, stating that he "understood" it was more like 75,000 to 100,000.

152. In March 2022, Spaulding admitted it had "several million clients who have entered that dormancy stage" and that "reactivations" were "flat."

153. At the end of the relevant period, Defendant Spaulding admitted that active clients had declined 4% quarter over quarter from the prior quarter.

154. Four distinct post-relevant period events confirm that Freestyle cannibalized Fix and that Defendant Spaulding's push to launch Freestyle notwithstanding the Company's extensive internal test results revealing cannibalization was a complete failure.

155. First, on September 30, 2022, Retaildive reported that "Stitch Fix is once again requiring potential customers to sign up for its styling service and order a box of clothing curated by a stylist in order to shop its 'Freestyle' e-commerce site." In other words, Defendants confirmed that they had again fully shuttered Freestyle to new customers. The article elaborated, "The prerequisite was reinstituted a few weeks ago, according to an employee who requested anonymity because they aren't authorized to discuss company details. A Stitch Fix spokesperson declined to confirm when the change was made or comment on why." The article explained that the basis for the undisclosed change was that "Freestyle was supposed to bolster the company's total addressable market, but almost immediately began to cannabilize [sic] the box business."

156. Second, Freestyle's failure led to the end of Defendant Spaulding's tenure at Stitch Fix. On January 5, 2023, the Company issued a press release announcing that Defendant Spaulding would "step down as CEO." Defendant Spaulding acknowledged in that press release that she was not the right person to lead Stitch Fix on its "ambitious transformation," and that her Freestyle initiative had taken the Company into the red: "in the immediate term, the focus for the

team is squarely on creating a leaner, more nimble organization to set the company up for a return to profitability." Defendants announced that Defendant Lake, former CEO and Executive Chairperson, would replace Defendant Spaulding as CEO on an interim basis—the lack of a ready replacement for Defendant Spaulding suggests that she was asked to leave.

157. Analysts were not surprised that the poor performance of Defendant Spaulding, and her Freestyle initiative, led to her departure. For example, Wedbush explained on January 5, 2023, that "Ms. Spaulding was given the CEO seat to spearhead the transition of the business model away from one focused on the legacy 'Fix' offering (a 'mystery box' of 5 items sent to a customer sight-unseen), and towards a business model diversified between 'Fix' and the newer 'Freestyle' offering (more akin to a traditional e-commerce model, with more personalization). However, the transition has been very rocky, due to both macro factors and internal missteps." William Blair also noted on the same day, "The announcement is not surprising given Stitch Fix's challenging performance under Spaulding's tenure as CEO, including the company's failed strategy around its direct business[.]" Also on the same day, Barclays further highlighted the Company's "self-induced missteps (e.g., . . . Fix vs. Freestyle onboarding flow mishaps)." Barclays acknowledged that Defendant Spaulding was, effectively, fired, concluding that "we're not entirely surprised that the Board opted to make a change." On the same day, J.P. Morgan similarly wrote that "Elizabeth's departure does not come as a surprise[.]"

158. Third, and contemporaneous with Defendant Spaulding's firing, the Company sent a letter to employees explaining that they would cut approximately another 20% of their salaried staff. This further cost cutting was necessary to return the Company to profitability after Freestyle had cannibalized the Company's core Fix business.

1

2   159. Finally, Defendant Lake, in her role as interim CEO, announced that

3   Stitch Fix intended to move away from Freestyle entirely. On March 7, 2023,

4   Defendant Lake announced that the Company would "refocus" on the Fix, and

5   that Stitch Fix would no longer think of Freestyle as a "separate business unit"

6   because it "was less effective" as a "customer acquisition vehicle." Defendant

7   Lake elaborated that "marketing Freestyle first wasn't as effective as what we

8   had done historically in Fixes, but it also actually made it harder for us to be able

9   to be acquiring people into the Fix channel." Defendant Lake reiterated on June

10  7, 2023 that after "a full analysis of our network strategy," Stitch Fix was

11  determined to "refocus[] on our core Fix business." Defendant Lake explained

12  that this was because of high "dormancy" or "churn rates" – meaning that

13  Freestyle-first clients purchased less and less frequently. Lake added that

14  Freestyle-first "clients did not generate the same level of engagement and

15  revenue delivery" compared with Fix clients. In other words, Defendant Lake

16  acknowledged that Freestyle-first clients cannibalized Fix clients during the post-

17  relevant period because they converted at lower rates and were of lower quality –

18  precisely what Stitch Fix's internal testing showed.

19  160. Defendants all knew but misrepresented and/or concealed the fact that

20  SFI's marketing channels were narrowing and/or closing due to the restrictive

21  privacy changes made to Apple IOS 14 operating system in version 14.5.

22  161. Defendants knew but concealed the increasing amount of

23  "dormancies" which previewed and predicted the material decline in active users

24  and new client additions.

25  162. SFI ended its high dollar referral program in Q3 of 2021 (*i.e.* the

26  quarter ended April 30, 2021) after finding that the customers it obtained through

27  the referral program were one-time customers not Fix enrollees or even repeat

28  Freestyle customers.

163. Defendants knew that SFI's own launch and promotion of Freestyle was directing customers who came to Stitchfix.com to Freestyle even if the customer was a Fix subscriber. As a result, the Fix subscriber just became a Freestyle customer instead. SFI called this process "onboarding" and Defendants knew that flaws in the onboarding was materially undermining SFI's business. Defendants knew but failed to disclose that a decrease in net client ads in July, August, September, October and November of 2021 was rippling through revenue.

164. By the end of Q-2 2021 (ended April 30, 2021) SFI had lost 161,000 active users from the prior quarter end (January 31, 2021) but failed to disclose this until March of 2022.

165. On March 8, 2022, after the market closed, Stitch Fix reported earnings for its second quarter of 2022, and offered a weak outlook for its third quarter of 2022 and cut its guidance for the full year. Later that day, during a conference call with analysts and investors to discuss the Company's earnings and operations for its second quarter, Defendant Spaulding attributed the guidance cut to problems with Freestyle. Specifically, Defendant Spaulding admitted that "in our efforts to launch and promote Freestyle, we chose to direct visitors coming to stitchfix.com towards the Freestyle experience" and "it is important to note that stitchfix.com is the primary landing page for customers interested in ordering a Fix. Therefore, in leading clients to the Freestyle experience first, we inadvertently created friction for those seeking a Fix." Stitch Fix also admitted that the Company "created friction when [it] introduced Freestyle to the landing page, given the intent of the majority of those clients coming to our site was for a Fix."

166. CEO Spauling also attributed the cut to Apple Privacy Updates with *iOS 14* stating:

Active clients declined 4% quarter over quarter. There were two factors that largely impacted gross adds: first, conversion of new visitors for Fix and Freestyle is not where we want it to be; second, given changes in iOS 14 marketing channels that have historically been effective for us are presenting challenges in effectively targeting clients.[3]

167. The potential for these Apple Privacy Update problems were known or should have been known to Stitch Fix and the Insider Trading Defendants long before these March 2022 disclosures because Apple updated its privacy policy which significantly reduced the ability of advertisers, like Stitch Fix, to collect and share 3rd party data in or around the Spring 2021.

168. As a result of these March 2022 disclosures, the price of Stitch Fix stock declined by $0.67 per share, or 6%, from a closing price of $11.01 per share on March 8, 2022, to a closing price of $10.34 per share on March 9, 2022.

169. Other industry experts also questioned why "The company has gone from a rapidly growing e-commerce stock with disruptive potential in the apparel industry to a declining business that looks utterly broken."[4]  The article concluded that the way Stitch Fix blamed "macro headwinds isn't a satisfying explanation for the stock's collapse over the last two years and the reversal in the business's fortunes."  Rather, "the company also seems to have botched the rollout of Freestyle, the formerly highly anticipated direct-buying platform that allows shoppers to choose clothes from a curated selection based on their style, fit, and budget. Stitch Fix initially offered Freestyle only to customers who had

---

[3] *See* https://adventureppc.com/blog/stitch-fix-opens-up-about-post-ios14-facebook-struggles

[4] Down 97%, What Happened to Stitch Fix Stock, Jeremy Bowman, Motely Fool (December 26, 2022) (https://www.fool.com/investing/2022/12/26/down-97-what-happened-to-stitch-fix-stock/)

ordered a Fix before expanding it to new customers. It then reversed that decision, and restricted Freestyle to only customers that had ordered a Fix."[5]

170. In the wake of the fraud, Defendant Spaulding was forced to resign from her position as CEO and Stitch Fix has effectively abandoned Freestyle as a business strategy. On January 5, 2023, the Company issued a press release announcing that Defendant Spaulding was not the right person to lead the Company's "ambitious transformation." Further, Defendant Lake, as interim CEO, announced on March 7, 2023 that the Company would "refocus" on the Fix, and that Stitch Fix would no longer think of Freestyle as a "separate business unit" because it "was less effective" as a "customer acquisition vehicle.

## INSIDER TRADING

171. The Insider Trading Defendants used their knowledge of material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated. As officers and directors of Stitch Fix, the Insider Trading Defendants were privy to material, nonpublic information about the Company's true business health as corroborated by former employees interviewed by counsel in the Securities Action.

172. The Form 4s filed with the SEC reporting these stock sales do not reference the date of any 10b5-1 Plans or any revisions or modifications thereof. These sales are also suspicious in both amounts and timing, and do not match previous trading practices, and therefore, the reasonable inference is that even if 10b5-1 plans were in effect, they were entered into with knowledge that the Company's stock price was inflated due to the false statements detailed herein.

173. The Insider Trading Defendants sold Stitch Fix stock as follows:

1. **Katrina Lake (CEO / Director)**

---

[5] *Id.*

| Filing Date | Trade Date | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|
| 2021-11-18 16:58:44 | 2021-11-16 | $31.48 | -100,085 | 9,557 | -91% | -$3,150,482 |
| 2021-10-20 16:58:57 | 2021-10-18 | $32.88 | -100,077 | 9,557 | -91% | -$3,290,031 |
| 2021-09-17 18:23:32 | 2021-09-15 | $34.22 | -105,126 | 9,557 | -92% | -$3,597,843 |
| 2021-08-18 17:51:40 | 2021-08-16 | $40.52 | -100,077 | 17,276 | -85% | -$4,054,853 |
| 2021-07-16 17:01:31 | 2021-07-14 | $56.01 | -131,327 | 17,276 | -88% | -$7,355,278 |
| 2021-06-21 16:49:29 | 2021-06-16 | $59.63 | -198,876 | 17,276 | -92% | -$11,859,695 |
| 2021-05-19 17:32:30 | 2021-05-17 | $43.47 | -100,077 | 24,994 | -80% | -$4,350,838 |
| 2021-04-22 16:10:02 | 2021-04-20 | $43.51 | -100,077 | 24,994 | -80% | -$4,354,557 |
| 2021-03-19 17:53:17 | 2021-03-17 | $53.19 | -136,366 | 24,994 | -85% | -$7,253,579 |
| 2021-02-24 18:30:21 | 2021-02-24 | $70.97 | -43,778 | 32,712 | -57% | -$3,106,771 |
| 2021-02-24 18:28:49 | 2021-02-23 | $67.08 | -43,775 | 32,712 | -57% | -$2,936,401 |
| 2021-02-24 18:27:25 | 2021-02-22 | $76.49 | -43,774 | 32,712 | -57% | -$3,348,065 |
| 2021-01-21 18:17:28 | 2021-01-19 | $80.51 | -131,327 | 32,712 | -80% | -$10,572,691 |
| | | | | | **Total** | **-$69,231,084** |

1
2

**2. <u>Mike Smith (Former Director, President, COO)</u>**

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Filing Date | Trade Date | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|
| 2021-11-15 17:48:02 | 2021-11-10 | $33.36 | -20,000 | 47,356 | -30% | -$667,159 |
| 2021-10-12 16:44:31 | 2021-10-11 | $33.49 | -20,000 | 47,356 | -30% | -$669,888 |
| 2021-09-27 17:16:33 | 2021-09-23 | $40.73 | -20,000 | 47,356 | -30% | -$814,667 |
| 2021-06-28 18:08:49 | 2021-06-24 | $62.29 | -20,000 | 47,356 | -30% | -$1,245,750 |
| 2021-06-17 16:23:33 | 2021-06-15 | $60.92 | -40,000 | 47,356 | -46% | -$2,436,876 |
| 2021-05-19 17:38:14 | 2021-05-17 | $43.31 | -40,000 | 47,356 | -46% | -$1,732,225 |
| 2021-04-19 17:12:53 | 2021-04-15 | $45.81 | -40,000 | 47,356 | -46% | -$1,832,329 |
| 2021-03-17 17:20:30 | 2021-03-15 | $57.46 | -40,000 | 47,356 | -46% | -$2,298,535 |
| 2021-02-18 16:08:24 | 2021-02-16 | $84.61 | -40,000 | 47,356 | -46% | -$3,384,382 |
| 2021-01-20 16:43:16 | 2021-01-15 | $74.39 | -40,000 | 47,356 | -46% | -$2,975,573 |
| | | | | | **Total** | **-$18,057,384** |

**3. <u>Marka Hansen (Director)</u>**

| Filing Date | Trade Date | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|
| 2021-08-09 16:58:49 | 2021-08-05 | $47.83 | -10,000 | 0 | -100% | -$478,300 |
| 2021-07-08 16:04:41 | 2021-07-06 | $62.57 | -10,000 | 0 | -100% | -$625,694 |
| 2021-06-09 16:27:29 | 2021-06-07 | $55.83 | -10,000 | 0 | -100% | -$558,305 |
| 2021-05-06 17:19:35 | 2021-05-05 | $42.19 | -10,000 | 0 | -100% | -$421,900 |
| 2021-04-07 16:10:16 | 2021-04-05 | $48.70 | -10,000 | 0 | -100% | -$486,992 |
| 2021-03-12 16:34:15 | 2021-03-10 | $50.08 | -10,000 | 0 | -100% | -$500,804 |
| | | | | | **Total** | **-$3,071,995** |

**4. <u>Mitchell Lasky</u>**

| Filing Date | Trade Date | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|
| 2022-08-12 18:13:10 | 2022-08-10 | $32.10 | -250,000 | 1,284,729 | -16% | -$8,025,150 |
| 2022-08-12 18:09:13 | 2022-08-10 | $18.19 | -75,672 | 260,736 | -22% | -$1,376,822 |
| 2021-06-24 21:00:51 | 2021-06-21 | $60.89 | -9,831 | 3,277 | -75% | -$598,648 |
| | | | | | **Total** | **-$10,000,620** |

**5. <u>Spaulding Elizabeth</u> (President)**

| Filing Date | Trade Date | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|
| 2021-06-10 17:06:53 | 2021-06-08 | $66.72 | -6,340 | 245,290 | -3% | -$423,005 |
| 2021-03-17 17:37:27 | 2021-03-15 | $60.02 | -17,494 | 251,630 | -7% | -$1,049,922 |
| | | | | | **Total** | **-$-1,472,927** |

174. The Insider Trading Defendants collectively sold approximately $102,049,877 worth of Stitch Fix stock during the Relevant Period.  Had the Insider Trading Defendants waited to make these sales until a month after the relevant period ended on March 8, 2022, their sales would have lost tens of millions of dollars.

## **BREACHES OF DUTIES**

175. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Stitch Fix, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

176. The Individual Defendants breached their fiduciary duties by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders.

177. The Audit Committee Defendants had a duty to review the Company's earnings, press releases, and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Stitch Fix's public statements and internal control functions.

178. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Stitch Fix, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a

result, Stitch Fix has expended, and will continue to expend, significant sums of money.

## DAMAGES TO STITCH FIX

179. As a direct and proximate result of the Individual Defendants' conduct, Stitch Fix has expended and will continue to expend significant sums of money.

180. Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Action filed against the Company for violations of the federal securities laws. Stitch Fix will incur additional expenditures and economic harm due to, among other things, amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and payments associated with the aforementioned issues.

181. As a direct and proximate result of the Individual Defendants' conduct, Stitch Fix has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DEMAND FUTILITY ALLEGATIONS

182. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

183. At the time this action commenced, the eight-member Board was comprised of Director Defendants Lake, Gurley, McCollam, Williams, and non-party directors Baer, Baxter, Tan, and Amoo-Gottfried.

184. Nonparty director Matthew Baer was appointed Chief Executive Officer and became a member of the Board of Directors effective June 26, 2023.

185. Nonparty directorsAmoo-Gottfried was appointed to the board effective December 19, 2022 and directors Timothy Baxter and Fiona Tan were appointed to the board effective October 14, 2024.

186. Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, five of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

187. According to the Company's proxy filed October 31, 2024, "Mr. Baer is not independent due to his position as the Chief Executive Officer of Stitch Fix and Ms. Lake is not independent because she is currently employed by the Company."

188. Additionally, Director Defendants Lake, Gurley, McCollam, and Williams authorized, signed, and/or permitted the false statements, including the Company's FY21 10-K, to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it. The Director Defendants breached their fiduciary duties, and face a substantial likelihood of liability. Thus, demand upon all the Director Defendants is futile, and therefore, excused.

189. As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core

operations and the material events giving rise to these claims. Specifically, as Board member of Stitch Fix, the Director Defendants knew, or should have known, the material facts surrounding the Freestyle program, including its impact and cannibalization of the legacy Fix business.

190. Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence.

**Lake**

191. Lake, an Insider Trading Defendant and defendant in the Securities Action, sold over $60,000,000 of Stitch Fix stock during the Relevant Period. She is also a confirmed non-independent director because she previously served as the Company's CEO from 2011 until July 2021. She also served as the Company's Executive Chairperson since August 2021, as a Company director since its inception in 2011, and as CEO since January 2023.

192. As a trusted Company director, she made and permitted or caused the Company to make false and misleading statements, consciously ignored her duties to monitor such controls over accurate reporting, and is liable to the Company for millions in insider trading disgorgement.

**Williams**

193. Defendant Williams is not disinterested or independent, and incapable of considering a demand because she served as member of the Audit Committee and signed the 2021 Form 10-K. Williams served on the Audit Committee in 2021 and 2022. Pursuant to the Audit Committee Charter, she was specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosure requirements. According to the Company's proxy filed November 2021, the Board had determined that

Williams is an "audit committee financial experts" within the meaning of SEC regulations.

**McCollam**

194. Defendant McCollam is not disinterested or independent, and incapable of considering a demand because she served as member and chairperson of the Audit Committee and signed the 2021 Form 10-K.  McCollam served as member and chairperson of the Audit Committee in 2021 and 2022.  Pursuant to the Audit Committee Charter, she was specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosure requirements. According to the Company's proxy filed November 2021, the Board had determined that McCollam is an "audit committee financial experts" within the meaning of SEC regulations.

**Gurley**

195. Defendant Gurley is not disinterested or independent, and incapable of considering a demand because he served as member of the Audit Committee and signed the 2021 Form 10-K.   Gurley served on the Audit Committee no later than 2022.  Pursuant to the Audit Committee Charter, he was specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosure requirements.  According to the Company's proxy filed November 2022, the Board had determined that Gurley is an "audit committee financial experts" within the meaning of SEC regulations.

196. Throughout the Relevant Period, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Freestyle program and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Gurley, McCollam, and Williams cannot

independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

197. Additionally, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Director Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Director Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Stitch Fix stock and stock options they held.

198. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Stitch Fix's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.

199. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

200. Furthermore, demand in this case is excused because the Director Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest precluded the Director Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director Defendants would be futile.

201. Significantly, none of the Director Defendants publicly commented or publicly investigated the insider trading discussed herein or have taken remedial action to redress the conduct alleged herein.  Disgorgement from the insider trading could have significant value for the Company, and the Director Defendants implicitly waived the Company's right to seek disgorgement.

202. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority, or all, of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.

203. Accordingly, demand is excused as being futile.

204. The acts complained of herein constitute violations of fiduciary duties owed by Stitch Fix's officers and directors, and these acts are incapable of ratification.

205. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of Stitch Fix. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or

certain officers of Stitch Fix, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused. there is no directors' and officers' liability insurance, then the directors will not cause Stitch Fix to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

206. Thus, for all of the reasons set forth above, all of the directors, and, if not all of them, certainly at least eight of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Defendants Anderson, Gurley, Hansen, Lake, Lynch, McCollam, Mohan, Smith, Spaulding, Svane, and Williams for Violations of Section 14(a) of the Exchange Act**

207. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

208. These Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

209. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

210. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

211. In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy was materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2021 Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval (on an advisory basis) of executive compensation.

212. The false and misleading elements of the 2021 Proxy led to the re-elections of the Director Defendants, allowing them to breach their fiduciary duties to Stitch Fix.

213. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omission in the 2021 Proxy.

214. Plaintiff, on behalf of Stitch Fix, has no adequate remedy at law.

## **SECOND CLAIM**

**Against Defendants Katrina Lake and Elizabeth Spaulding for Contribution Under Section 11(f) of the Securities Act and Section 21D of the Exchange Act 245**

215. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216. As a result of the conduct and events alleged above, the Company is a defendant in the Securities Action brought on behalf of Stitch Fix shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

217. Federal law provides Stitch Fix with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

218. The plaintiffs in the Securities Action allege that SEC reports contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

219. Defendants Lake and Spaulding were responsible for the contents and dissemination of these reports.

220. Defendants Lake and Spaulding because of their positions of control and authority as officers and/or directors of Stitch Fix, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Stitch Fix, including the wrongful acts complained of herein and in the Securities Action.

221. Accordingly, Defendants Lake and Spaulding are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of

action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

222. As such, Stitch Fix is entitled to receive all appropriate contribution or indemnification from Defendants Lake and Spaulding.

## THIRD CLAIM

### Against Defendants Lake and Spaulding For Contribution Under Sections 10(B) And 21d Of The Exchange Act 254

223. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

224. Defendants Lake and Spaulding are named as defendants in the Securities Action which asserts claims under the federal securities laws for violations of Sections 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act. If and when the Company is found liable in the Securities Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Defendants Lake and Spaulding willful and/or reckless violations of their obligations as officers and/or directors of Stitch Fix.

225. The Individual Defendants, because of their positions of control and authority, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Stitch Fix, including the wrongful acts complained of herein and in the Securities Action.

226. Accordingly, the Defendants Lake and Spaulding are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the

application of a private right of action for contribution arising out of violations of the Exchange Act. 258. As such, Stitch Fix is entitled to receive all appropriate contribution or indemnification from the Defendants Lake and Spaulding.

## FOURTH CLAIM

### Derivatively On Behalf Of Stitch Fix Against The Insider Trading Defendants For Breach Of Fiduciary Duty

227. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

228. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Insider Selling Defendants were unjustly enriched at the expense of, and to the detriment of, Stitch Fix.

229. The Insider Trading Defendants had access to non-public information concerning Stitch Fix and were motivated to sell Stitch Fix stock by the MNPI.

230. The Insider Trading Defendants are fiduciaries of Stitch Fix, possessed MNPI of Stitch Fix, and used that information improperly in selling Stitch Fix stock because they were motivated, in whole or in part, by the substance of that MNPI of Stitch Fix, and acted with scienter.

231. The Insider Trading Defendants exploited their positions at, and ownership of Stitch Fix and profited from their misconduct and their exploitation of material and adverse inside information.

232. The other Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Stitch Fix that was tied to the performance or artificially inflated valuation of Stitch Fix,

or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

233. Plaintiff, as a stockholder of Stitch Fix, seeks disgorgement of all profits and all profits on profits, including from insider transactions, benefits, and other compensation, obtained by the Insider Trading Defendants due to their wrongful conduct and breach of their fiduciary duties.

234. Plaintiff, on behalf of Stitch Fix, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants For Breach Of Fiduciary Duties

235. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

236. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Stitch Fix's business and affairs.

237. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

238. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Stitch Fix. In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

239. In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

240. Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements during the Relevant Period. As a result of the foregoing, Stitch Fix's public statements were materially false and misleading at all relevant times.

241. The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

242. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

243. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate

internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

244. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

245. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Stitch Fix has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

246. Plaintiff, on behalf of Stitch Fix, has no adequate remedy at law.

## SIXTH CLAIM

### Claim For Unjust Enrichment
### Against Individual Defendants

247. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

248. By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Stitch Fix.

249. The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Stitch Fix tied to the performance or artificially inflated valuation of Stitch Fix, or received compensation that was unjust in light of the Individual Defendants' bad

faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

250. Plaintiff, as a stockholder and a representative of Stitch Fix, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including benefits, performance-based, valuation-based, and other compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

251. Plaintiff, on behalf of Stitch Fix, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.   Determining that this action is a proper derivative action, demand is excused, and that Plaintiff may maintain this action on behalf of Stitch Fix, and that Plaintiff is an adequate representative of the Company;

B.   Declaring that the Individual Defendants have breached their fiduciary duties to Stitch Fix;

C.   Finding that the Insider Trading Defendants have breached their duties and awarding Stitch Fix disgorgement of all insider trading profits to be distributed pro rata to shareholders other than the Insider Trading Defendants;

D.   Determining and awarding to Stitch Fix the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

E.   Directing Stitch Fix and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Stitch Fix and its stockholders from a repeat of the damaging events described herein;

F.   Awarding Stitch Fix restitution from the Individual Defendants;

G.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all issues so triable.

**FORD & DIULIO PC**

*/s/ Brendan M. Ford*

Brendan M. Ford
Kristopher P. Diulio